Thank you, Your Honors. May it please the Court, my name is Alex Higgins. I'm here on behalf of Kathleen Huge. I'm here along with my co-counsel, Matthew Bean. At its core, this case poses an important question. Whether a disabled individual can try to perform a job without a reasonable accommodation, even where one is possible or suggested. The ADA was not passed to require a disabled individual to accept a reasonable accommodation, nor was it passed to give employers the right to assume a disabled individual must need an accommodation. In fact, the opposite is true. It was passed to eliminate assumptions and stereotypes about what disabled individuals might or might not need. Let me just ask a question then at the very beginning. Did you raise the question that the requirement of a medical exam for the Long Beach job was job-related, per se? Under 42 U.S.C. 12112B, did you ever raise that? Yes, we raised that at the outset, before the case even started, and we raised it throughout the trial that all of these medical examinations beyond the first request for more information was an invalid requirement of a medical exam under the ADA throughout the case. So it related to the Renton job and the Long Beach job. Did you raise it in your pleadings? In our pleadings below? Yes, and in your complaint to us. I am quite sure we did. I know that in the reply brief on page 16, we talked specifically about 29 CFR section 1630.9 as it relates to the Long Beach job, that an individual with a disability is not required to accept an accommodation which such qualified individual chooses not to accept, for example. So I think the I guess I was just worried where you had waived that issue, because I couldn't seem to find where you had raised that issue that it was job-related anywhere on its way up to us. Well, I think it's Boeing's, well, I guess let me first start by trying to clarify your question. It's Boeing's obligation to prove that it is a job-related and business necessity, not our job to prove that it is not. So we definitely objected to the necessity of the medical examinations Ms. Hughey was subjected to along the way throughout the trial and in our briefing to you, but the district court ultimately found, and we're not challenging, that those medical exams were necessary as to the job in Renton. But there were no findings by the district court that there was a business necessity as to the job in Long Beach. He simply said there wasn't discrimination and they needed somebody right away, and so they didn't need to accommodate her by extending that job. All right. Thank you. Your Honors, I'm very sorry. I need to go back to the beginning. I failed to reserve  Of course. Thank you, Your Honors. All right. Back to where I was going, which is to this CFR that says an individual with a disability doesn't have to require an accommodation, but if they don't and if they want to be treated just like everybody else, then they're going to be held to that same standard. And that's what Ms. Hughey was asking for. There had been a mess created in Renton, and she was high-functioning autistic. She had made a mistake. I mean, her in Boeing, in terms of who's to blame, it doesn't matter now. The district court found that she was Court found your client Right. For a large share of the blame, right? Absolutely, Your Honor. And why? So just going back to the point you were just making about the Long Beach job, why under Harris wasn't Boeing entitled to say, you know what? We know about the issues you've had in Renton. The job that you're going to take in Long Beach is not so different in kind that we could assume that you'd be able to perform it without our figuring out what accommodations you might need. And so, therefore, we are going to need the results of this. I can't remember. Is that a medical exam or whatever? The things you were supposed to do with Dr. Brown that We'll call it a medical exam. It's fine. Yes. Okay. So but Harris seems to me to be a barrier to your winning here. So help me with that. Harris is distinguishable for many reasons. Number one, Harris was a, importantly, asking for this person who had carpal tunnel syndrome, came back a short time later for the same job, to simply provide a clearance from the doctor, a release to go back to work. It was a very basic form. Ms. Hughey had provided that from four different providers by the time the Long Beach job was offered to her. So we're way, way beyond the facts of Harris. Harris also involved a physical injury, which I think the employer, it's a little clearer, you know, can this person lift this amount as opposed to high functioning autism where there's inherent subjectivity and you look at the medical and there are things like, well, she might benefit from a job coach. But nobody said she couldn't do the job at Long Beach. In fact, there's a Dr. Stobie. This is really important. ER 210. Dr. Stobie says a new job in Long Beach would be ideal for her. Yeah. But the broader principle that Harris stands for that, again, I think stands as a barrier to your prevailing is that the employer is not required to put on blinders to what it learned before in its previous interactions. And here, Bowie knew that your client had had issues in Renton with the type of job she had. There was every reason to think that she would have similar types of issues with the job in Long Beach. I don't think you can say that that job was so different in kind that whatever issue she had in Renton weren't likely to to to arise. And we agree that Harris was correctly decided that you don't need to put on blinders. But But the point being that your client can't just show up in Long Beach and say, hey, I'm good to go. Don't I don't need any accommodation now. I think Boeing is entitled under Harris to say, well, you might be saying that now, but we actually need to work through through a medical provider what kinds of accommodations might be necessary. But the effect of that is running out the clock on Miss Yugi's job opportunity in Long Beach. Well, that's why the district court's finding that it was really your client's fault come October that that process had not been finished. Your client participated in bad faith in the interactive process, and it could have been done back in July for all we know. Well, the bad faith with regard to the interactive process doesn't give an employer carte blanche to discriminate based on disability. It doesn't give the employer the right to say, well, now we're just going to do whatever we want to you. And just because you had a disability in the past and request that a reasonable accommodation in the past, we're going to do whatever we want. We're going to require you to jump through eight million hoops with different doctors, and we're going to run out the clock on any job opportunity you get. So I don't think the judges, the district court's finding of bad faith with regard to Renton applied to Long Beach. And in fact, the district court did not apply it to Long Beach. The district court said, you don't win Long Beach because Dung Tran, the decision maker down there, only knew that you were on medical leave. And that misses the point entirely because it wasn't Dung Tran who said, you cannot be released from your involuntary medical leave. It was Boeing upper management, including legal, who said, no, no, no. We're not releasing you until we get every piece of information we want. I think it would be a dangerous precedent for this court to say an employer can not not only does an employer not have to wear blinders, but an employer can look through the employee's history under an electron microscope to find some reason not to let that person go to a job where they just want a clean slate. She wanted to work in a job that's a lower level. She's going from a mechanical engineering three down to a two. And she says, I just want to try a clean slate. This guy wants to hire me. He says I'm qualified. Boeing admits that she's qualified by offering her the job. She wants to go start fresh down there. And Boeing is saying, no, no, no, we have four medical providers clearing you, but we need a fifth one now to review all this data and provide it. That's discrimination. And the district court made no finding about whether that was discrimination. What he said was they didn't have to provide her a reasonable accommodation because she didn't operate in good faith, which is, I think, correct as to the rent and job. If you don't operate in good faith on the reasonable accommodation, you don't get a reasonable accommodation. But you should still have the right to say, okay, I want to try without an accommodation then and see if I can be treated the same as everyone else and meet everyone else's needs. It's a question of whether she would have been successful in Long Beach. I think Harris is to the contrary. That's what the person in Harris said. I'm fine. Whatever issues I had before, I'm good. I don't need any accommodation. I want to start back. And the employer said, well, no, we already have, we already know your history. And so we're not going to allow you to do that until you get an appropriate clearance. Here, it seems to me it's the same thing. Well, if you look at what Harris was actually asking the employee for, it was a very simple release in Harris. It was a very, it was what the court actually referred to as a progress report, more akin to a progress report than a comprehensive evaluation from a general practitioner. So the court on page 843 of Harris makes it very clear that they're just saying Mr. Harris needed to provide something from a doctor saying it's okay for you to go to work. Look at the medical clearances provided by Ms. Hughey. Look at Dr. Stoebe at ER 210 where he says this job, not only could she do it without any medical restrictions, it would be ideal. What more should an employee have to present to an employer than a recognized expert in this field, Dr. Gary Stoebe of the University of Washington saying this job would be ideal for her and she does not need a reasonable accommodation. So the way I understood the ADA in terms of the big picture in this case is that you don't look at the employer as the entity. You focus on the nature of the job. If she wanted to apply to be a custodial worker, it does not make sense to me, particularly given the ADA's language in 42 U.S.C. 12112B6 that a test or other selection criteria as used by the covered entity is shown to be job related for the position in question. So I'm having trouble with the concept that because she was incapable of being a nuclear physicist and interacting with the public, that that should somehow affect her ability to apply for a manual labor position with the same company. Am I missing something? I don't know because I'm not tracking necessarily. Is your question whether she, I'm sorry, I don't know whether she would perform with or without accommodations for a particular job? I think that's correct. Right. Exactly. Oh, that's your point. Yes. A nuclear physicist, right, essential functions of being a nuclear physicist might be different than being a janitor. I agree. And so your question for me is what? Well, isn't that the point here? She was applying for a completely different job and whether the door had been closed on her because she had engaged in, you know, many failings in the prior job, why should that affect her ability to apply for a lesser job that had less, you know, physical demands if the whole purpose of the ADA is focusing on the job related accommodation issue? Well, I agree with much of what you're saying, which is that it shouldn't make any difference. And she should be allowed to say, I can do, I may be, you know, I'm having trouble with the level three job, but I'd like to try a level two job and I don't think I need an accommodation. And the doctors all say, yeah, try it. I'd like to be a manual laborer. I'd like to clean windows. Right. Does the prior medical prohibition or stay prevent her as a matter of law? It should not. I don't see any reason why that should prevent her from working in a different capacity at Boeing. And in fact, I think it would violate the ADA to prevent her from doing so. I see that I'm down to a minute 46. I'd like to reserve the remainder. Yes, absolutely. We'll hear from counsel for Boeing. May it please the court, Thomas Peterson for the appellee. I'd like to start with the point that my colleague raised about the reasonable accommodation claim and the scope. He suggested that the court didn't make any findings of reasonable accommodation that would extend or that its findings on that topic would extend to the Long Beach job. And I don't think that's supported by the findings that the court made. It repeatedly emphasized that throughout the interactive process, there was a failure by the plaintiff to engage in good faith in the interactive process. And it rooted those determinations in part in its credibility assessments. And so it concluded that no reasonable accommodation was then required because plaintiff essentially forfeited that right by failing to engage in the interactive process while And it also made a specific finding that the reason why the medical leave was extended longer than it might otherwise have been was because of the disruption and failure to cooperate. So I don't think we can say those findings don't have any application as to Long Beach. Your Honor, I think your point has to be made. Okay. Well, let's hear your response to the point that counsel on the other side has pressed most forcefully this morning, which is that, look, she wanted to start afresh with this new position. It maybe had totally different job responsibilities. Whatever issue she had had in the Renton job, why was there any reason for Boeing to assume that that would be a problem in Long Beach when, in fact, she was now saying, I don't need any reasonable accommodation and I'll sink or swim on my own, you know, on my own abilities? Okay. I think there's a whole series of responses to that position. I'd like to start, Judge about the nature of this other job. She was applying for another engineering job. It was in a different location and it had a different focus of attention, but it was not some sort of lower level janitorial type position. The job she was applying to do was to work in the part of Boeing where airlines call and ask about parts and how they can use those parts for air conditioning or need to be repaired for some other reason. So this was not some sort of job disassociated from Has there been a factual finding that the jobs were essentially the same in terms of requirements? You're just representing that to us. No, I'm representing that based on, that's what the evidence describes as to the nature of the job. But, no, I don't think the Court actually made a finding about the, whether there was a similarity. But we do know, and there's really no dispute about this, that it was an engineering job. And we also know there's a variety of characteristics. Let's assume it wasn't the same type of job. Would you agree with the points that I made earlier? I would agree that you focus on the job, but I would disagree that on this record that there should be a continuation of the examination necessary to deem her qualifications to do that job. I say that for a couple of reasons. First, Harris strongly suggests that once the employer has knowledge of the need for an accommodation, that duty continues. It's not the only case that says that. If you look at this Court's Humphrey decision, it makes very clear that once the interactive process is triggered, there's an independent duty to continue to engage in that process, even wholly apart from a request. Now let's also talk about that medical examination process. That medical examination process started in June when she went on leave. That was the purpose of it. And not long after, this is in July, the plaintiff's lawyer wrote to Boeing July 27th and said, we're willing to cooperate with Boeing to see through this medical examination process. Now to your Honor's point, that the job was the job sufficiently different that you couldn't assume that because of the characteristics of the first job, that she might be unable to do the second job. Look at what the doctors, the information she supplied, look at what her other assistants. Take first Dr. Kapler, one of her physicians, the person who I believe diagnosed her in Ohio. He said ER 183, some sort of accommodation and job coaching is required, quote, when changing to or starting a new work group. That's exactly what she was proposing to do here. That's her own doctor. Dr. Kong Wong, who she also consulted with, wrote to Boeing on June 26th that she needed a job coach, though she confessed not having a lot of expertise about the subject. Dr. Frazier, again, proposed that there be a job coach. He later withdrew the requirement of written instructions, but he said there would be a job coach particularly during a performance review period. Here, Ms. Bloom, August 14th, SER 595, a job coach will be required to address stressful interpersonal situations, strategic support for interpersonal dealings, and to help establish clear guidelines. Now, look at what the evidence tells us about the job she was proposing to transfer to. It was a job where they received calls from airlines who were seeking out parts and other information to deal with planes that needed to be repaired, and there was a backlog of 300 unanswered calls. Someone in this position had to deal with this 20 or 30 calls a day, and in those circumstances, there was a Boeing policy that a response had to be provided within an hour, if at all possible. The information Boeing had suggested that that job is the kind of job that would require her to still have an accommodation based on what it had been told by her own medical experts and the people she consulted with. Now, you heard about Dr. Stobie. But Boeing didn't make any of those findings. Boeing just said, we don't have enough time to wait for her. Well, but Your Honor, the court made a specific finding that the reason why this process was still underway was because of her failure to cooperate in the good faith process that the ADA requires. This would have all been resolved much sooner than that. What I'm trying to do is respond to Your Honor's point, which is, what does the record tell us about whether Boeing could reasonably have been expected not to seek out a conclusion of this process with respect to her evaluation that had been started, and as they say, in July 27 plaintiff's lawyer has said it was something we were willing to cooperate with. Now, if the district court is right about her bad faith, does this mean that she could never get a job at Boeing? Your Honor, I don't know that it necessarily does. I mean, I think what it does is it precludes her from bringing a claim based upon either the failure to accommodate or on the theory that somehow there was something untoward with respect to Boeing's decision not to hold this job open for her. I don't think it would necessarily vitiate her capacity to get some sort of a job, but I do think it defeats the claims that she has in this case. All right. Now, let me just also go back to completing this litany of items which make Boeing's conduct altogether reasonable in concluding that this job, that it should assume that there was still need to evaluate reasonable accommodation. The next fact that I think is crucial, my friend talked a lot about Dr. Stobie and what Dr. Stobie said based upon a reference to ER 210 in the record. That's something Dr. Stobie said in an initial evaluation he did on September 27. He was asked to do in a further evaluation because it was based on no more than a one-hour consultation when what had been requested was a more elaborate report. And if you look in the record at stipulated fact 37, ER7, what you'll find is that Boeing received on October 16th a recommendation from Ms. Davies who did a more thorough evaluation that a job coach would be required. And on October 19th, the same Dr. Stobie said that a job coach was required. Now, another fact which I think has kind of gotten lost in all of this, plaintiff never communicated to Boeing that she did not meet a job coach at the new job until after she'd failed to report to that position. The only evidence in the record that I know of which is an email on October the 8th which was sent by Mr. Bean in response to an email he'd received from Ms. Ladd who was in the Boeing Law Department. This is at ER202. That's the first place in which it's suggested to Boeing that in the process of applying for this position at Long Beach that the plaintiff was not expecting any kind of a job accommodation. But even that email is equivocal because that email also says, and in any event, the results of this evaluation, this evaluation which I told you they agreed they would cooperate with, the results of this evaluation will be available in a few days. So why can't we just wait for that? Well, the truth is, it wasn't available in a few days. And in any event, the record is really, there is this court-specific finding as to which there's ample supporting evidence that Mr. Tran, who was the decision-maker with respect to the job, reasonably believed that he had to act quickly because of the 300 backlog. Isn't that an end run around the whole purpose of the ADA, though? I mean, I don't understand that logic. So if she had applied to be a cook, would the medical issue that had prevented her from applying for any other job at Boeing as a matter of law still trumped? I'm having trouble with the whole concept that Boeing didn't make a finding or didn't do any analysis that would suggest that because of what happened at Renton and her ability to perform that job, that that equally applied to whatever this new job was, be it a cook or another engineer. That part just structurally strikes me as maybe we're getting into an area where we're going to do damage to the purpose of the ADA in requiring that, you know, you look at discriminatory intent and you, or effect, and you ask, you know, you look at things in terms of what the particular job is. That's my concern. Well, but Your Honor, what I hope I've conveyed is that Boeing had, from the medical experts that were her experts, Boeing had a series of statements which said the kinds of circumstances that would require accommodation were the kinds of circumstances that would reasonably be associated with the job to which she was seeking transfer. She had never made clear until after she didn't report for the job that she — The district court didn't make that finding. It just said there was a business necessity. No, I don't think it said there was a business necessity, Your Honor. What it said was, what it said was that the initiation and the — its conclusion of law, I believe it's number 14. What it says is, is that the interact — that the Boeing acted in a nondiscriminatory manner and for nondiscriminatory reasons with respect to this leave that started in June with respect to seeking out whether or not there was an accommodation that could be provided to her. And that Boeing acted lawfully and for nondiscriminatory reasons with respect to that. And it seems to me that the evidence that I've talked about, the failure to communicate, the lack of a need of accommodation, and these doctors who are saying that there are circumstances that require a job accommodation for her which are consistent with the characteristics of the job to which she is seeking transfer, you take all of those facts, that's enough to suggest that there's nothing — that the court could legitimately determine that Boeing did not act unlawfully in these circumstances. You can then overlay the fact that I think there's a danger with the way plaintiff is trying to litigate this case. This case was not litigated as a Long Beach case, I think, in response to Judge Nelson's questions. I don't think a lot of the positions that you're hearing now were clearly staked out as discrete, actionable incidents. This was a whole series of activities. Long Beach is part of the accommodation process. She seeks out the Long Beach position when she's resisting the idea of being entitled to influence the person who's supposed to do the medical examination as part of the accommodation process. So it's all part of the misconduct, if you will, in the conducts of the interactive process. And the circumstances of her behavior undoubtedly meant that she wasn't available in October because that process would have all been reasonably concluded much sooner if she hadn't acted repeatedly to interfere with it and not to act in good faith. So I think unless the court has questions — thank you. All right. Thank you very much. We'll hear from counsel for the plaintiff. Yes. Thank you, Your Honors. I want to make a couple of points. First of all, counsel referred to my co-counsel's communications with Boeing's in-house counsel on October 8th when the Long Beach job was being withdrawn. And he wrote to in-house counsel, it's too bad that Ms. Hughey simply can't be told to report to the position in Long Beach. She could be there in days. She isn't requesting any accommodation there. For this reason, there should be no business necessity to have her evaluated in the first place. So going to Judge Nelson's question, this was raised from the outset of this case before this lawsuit was even filed. The information that counsel just talked about on October 16th and later regarding Dr. Stobie and whether she needed a job coach or not, that was all irrelevant to Long Beach because Long Beach had been withdrawn by then. And we were talking about what she might need to go back to Renton and be successful. But what's your response to your opponent's description of the facts that Boeing had before it that suggested that, in fact, she would need the same kinds of accommodations in Long Beach that she was needing in Renton? Well, I would say that that is, first of all, wrong. And secondly, if they had those questions, they certainly didn't ask them of Ms. Hughey's counsel on October 8th or of Dr. Stobie, who on September 7th wrote, with regard to Long Beach in particular, her option of relocating to a new group such as the job that she has identified in Long Beach seems ideal, et cetera, and would improve the likelihood of success in the workplace. So if they were serious about making this work in Long Beach... But you were citing your client's own doctors who said that she would need a job coach in the kinds of circumstances she would face in Long Beach. No, they said, should consider a job coach. These are things that should be considered for her. Not in Long Beach. Nobody ever said in Long Beach. Right. He was describing generically the kinds of work situations in which she would need that type of accommodation. And it turns out, unlike, say, a janitorial position, perhaps, that the job in Long Beach presented those circumstances. And then we come full circle back to the first point, which is, does an employee then have the right to say, I don't want that accommodation? I don't want a job coach. I want to try... No, not when the person is an initial employee, perhaps, but not when they've already had a history with that employer. That's why I was citing the Harris case, because that case suggests that once the employer learns what your potential limitations are, it need not forget about all of that history. Let me take one more shot at Harris. And I think Harris says you need to at least get a doctor to okay you trying without an accommodation. That you're safe to return to work. You're not going to injure yourself. And she got that four times, saying, yes, she can give it a try. And Boeing is not entitled to stand in her way and say, no, you're disabled. We assume you can't do it, and you're going to need an accommodation. Okay. Thank you, counsel. The case just argued will be submitted.
judges: D.W. Nelson, Watford, Pregerson